James BARBER, Individually and as
next friend of J.B., a minor,
Plaintiff–Appellant,

v.

James MILLER, Defendant–Appellee.

No. 15–1404.

United States Court of Appeals,
Sixth Circuit.

Dec. 2, 2015.*

Rehearing En Banc Denied Jan. 29, 2016.

* This decision was originally issued as an "unpublished decision" filed on December 2, 2015. The court has now designated the opinion as one recommended for full-text publication.

**ON BRIEF:** J. Nicholas Bostic, Lansing, Michigan, for Appellant. Lisa C. Geminick, Office of the Michigan Attorney General, Lansing, Michigan, for Appellee.

Before: NORRIS, CLAY, and COOK, Circuit Judges.

COOK, Circuit Judge.

Plaintiff James Barber, the biological father and legal guardian of J.B., a minor, sued Defendant James Miller, a social worker, alleging § 1983 claims related to Miller's in-school interviews of J.B. on suspicion of child neglect. These interviews led to a court order placing J.B. in protective custody. Barber also challenged the constitutionality of a Michigan statute authorizing such in-school interviews. The district court dismissed the claims against Miller on grounds of absolute and qualified immunity and dismissed Barber's constitutional challenge for lack of standing. We AFFIRM.

## I.  Facts

In January 2011, a member of Barber's family reported to the Children's Protective Services unit of the Michigan Department of Human Services (CPS) that Barber was neglecting J.B. Soon after, Miller, a CPS social worker, interviewed J.B. at his public elementary school without first obtaining a court order or Barber's consent. That same day, Miller interviewed Barber and inquired about his use of con-

trolled substances. Barber defended his marijuana and prescription-drug use as medically authorized. Six days later, Miller again interviewed J.B. at school without a court order or parental consent. He also spoke with J.B.'s paternal grandmother, Mary Lou Buttis.

These various interviews prompted Miller to petition the family court to place J.B. in protective custody pending a hearing. *See* Mich. Comp. Laws §§ 712A.14b, 722.638. The court issued a protective-custody order; Miller picked J.B. up from school pursuant to that order. After a two-day hearing held over three calendar days, the judge found probable cause to support one or more allegations in the petition. Deciding to return J.B. to Barber's custody nevertheless, the judge conditioned the return on: Barber's abstaining from marijuana until further notice of the court, submitting to drug screening, and ensuring that J.B. has constant adult supervision.

Displeased with the intervention by CPS, Barber sued Miller under 42 U.S.C. § 1983 for violating his constitutional rights. He alleged that Miller violated J.B.'s Fourth Amendment rights and Barber's Fourteenth Amendment substantive due process rights by (1) interviewing J.B. at school without a court order or parental consent, (2) littering the protective-custody petition with falsehoods and misrepresentations, and (3) removing J.B. from school pursuant to the protective-custody order. Barber also sought a declaratory judgment striking down Mich. Comp. Laws § 722.628(8), (9)—the statute authorizing CPS to conduct in-school interviews of suspected child-abuse victims without parental consent—as facially unconstitutional under the Fourth and Fourteenth Amendments.

Miller moved to dismiss, and the district court granted the motion as to all claims.

Specifically, the court cited *Pittman v. Cuyahoga County Department of Children & Family Services*, 640 F.3d 716, 724 (6th Cir.2011), in holding Miller absolutely immune from suit for statements included in the protective-custody petition. The district court then dismissed—on qualified-immunity grounds—claims related to the in-school interviews because Barber failed to show that clearly established law prohibited that conduct. The court also held that qualified immunity shielded Miller from liability for removing J.B. from school because the court's protective-custody order authorized that removal. Finally, the court denied on standing grounds Barber's request for a declaratory judgment, given that Barber could not show a likelihood of future injury. Barber appeals.

## II. Standard of Review

■ "Whether a defendant is entitled to absolute or qualified immunity from liability under 42 U.S.C. § 1983 is a legal question that this Court reviews *de novo.*" *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir.2009) (citing *Gregory v. City of Louisville*, 444 F.3d 725, 737, 742 (6th Cir.2006)). Likewise, we give fresh review to the district court's legal determination of Article III standing. *Johnson v. Econ. Dev. Corp.*, 241 F.3d 501, 507 (6th Cir.2001) (citing *Coyne ex rel. Ohio v. Am. Tobacco Co.*, 183 F.3d 488, 492 (6th Cir. 1999)). At this stage, we construe Barber's complaint in the light most favorable to him, accepting all well-pleaded factual allegations as true. *Thompson v. Bank of Am., N.A.*, 773 F.3d 741, 750 (6th Cir.2014) (citing *LULAC v. Bredesen*, 500 F.3d 523, 527 (6th Cir.2007)).

## III. Absolute Immunity

■ Barber first argues that Miller violated both his and J.B.'s constitutional rights by including false and misleading

statements in the petition for a protective-custody order. As *Pittman* teaches though, social workers enjoy absolute immunity when acting in their capacities as legal advocates. 640 F.3d at 724–25 (citing *Holloway v. Brush,* 220 F.3d 767, 775 (6th Cir.2000)). A social worker acts as a legal advocate when initiating court proceedings, filing child-abuse complaints, and testifying under oath. *Id.* And this absolute immunity holds, even under allegations that the social worker intentionally misrepresented facts to the family court. *Id.* at 723–25 (holding that a social worker accused of making numerous misrepresentations in a child-abuse complaint and two supporting affidavits enjoyed absolute immunity because she was acting "in her capacity as a legal advocate" when she submitted those documents). Absolute immunity enables social workers to "protect the health and well-being of the children . . . without the worry of intimidation and harassment from dissatisfied parents." *Id.* at 725 (quoting *Kurzawa v. Mueller,* 732 F.2d 1456, 1458 (6th Cir.1984)).

█ Here, Barber complains that Miller included false and misleading statements of fact in the protective-custody petition. But Miller offered his factual assessment in his capacity as a legal advocate initiating a child-custody proceeding in family court; *Pittman* therefore shields. And though Barber invites this court to revisit *Pittman,* we may not. *See United States v. Elbe,* 774 F.3d 885, 891 (6th Cir.2014) ("A panel of this court may not overturn binding precedent because a published prior panel decision 'remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision.'" (quoting *Salmi v. Sec'y of Health & Human Servs.,* 774 F.2d 685, 689 (6th Cir.1985))). Miller thus enjoys absolute immunity against allegations of false and misleading statements to the family court.

## IV. Qualified Immunity

█ Barber also claims that Miller violated J.B.'s Fourth Amendment rights and Barber's Fourteenth Amendment rights by interviewing J.B. at school and later taking J.B. into protective custody. There being no grounds for Miller to invoke absolute immunity as to these actions, *see Pittman,* 640 F.3d at 724, we examine his right to qualified immunity.

█ As it is well-understood, we only briefly review the governing law. Once a defendant invokes qualified immunity, the plaintiff bears the burden of showing that (1) the defendant's acts violated a constitutional right and (2) the right at issue was clearly established at the time of the defendant's alleged misconduct. *Barker v. Goodrich,* 649 F.3d 428, 433 (6th Cir.2011) (citing *Pearson v. Callahan,* 555 U.S. 223, 232, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)). Reviewing courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case." *Pearson,* 555 U.S. at 236, 129 S.Ct. 808.

In *Pearson,* the Supreme Court detailed a range of circumstances in which courts should address only the clearly established prong. *Id.* at 236–42, 129 S.Ct. 808. Several of those circumstances apply here. First, "it is plain" that the constitutional right that Barber seeks to enforce is not clearly established but it is "far from obvious whether in fact there is such a right." *Id.* at 237, 129 S.Ct. 808. Second, because the question of qualified immunity arose at the pleading stage, "the parties have provided very few facts to define and limit any [constitutional] holding." *Id.* at 238–39, 129 S.Ct. 808 (quoting *Robinette v. Jones,* 476 F.3d 585, 592 n. 8 (8th Cir.2007)).

Third, Barber's briefing on the constitutional question lacks clarity and detail, posing a risk that we will decide the issue incorrectly. *Id.* at 239, 129 S.Ct. 808. We therefore confine our inquiry to the clearly established prong of the qualified-immunity analysis.

■■■■ "For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Leonard v. Robinson,* 477 F.3d 347, 355 (6th Cir.2007) (quoting *Greene v. Barber,* 310 F.3d 889, 893 (6th Cir.2002)) (internal quotation marks omitted). We examine the asserted right "in light of the specific context of the case, not·as a broad general supposition." *Lyons v. City of Xenia,* 417 F.3d 565, 571 (6th Cir.2005) (quoting *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). When determining whether the right is clearly established, "we look first to decisions of the Supreme Court, then to our own decisions and those of other courts within the circuit, and then to decisions of other Courts of Appeal." *Andrews v. Hickman Cnty.,* 700 F.3d 845, 853 (6th Cir.2012).

### A. The In–School Interviews

Barber contends that Miller violated J.B.'s Fourth Amendment rights and Barber's Fourteenth Amendment rights by interviewing J.B. at school on suspicion of child neglect. He protests Miller's conducting these interviews in the absence of a court order or parental consent. Because Barber fails to show that these rights were clearly established at the time of the interviews, Miller enjoys qualified immunity.

### Fourth Amendment Rights Not Clearly Established

We find that J.B.'s Fourth Amendment right to avoid warrantless, in-school interviews by social workers on suspicion of child abuse not to have been clearly established in January 2011, when Miller interviewed J.B. Barber relies on *Andrews v. Hickman County,* 700 F.3d 845 (6th Cir. 2012), and *Kovacic v. Cuyahoga County Department of Children & Family Services,* 724 F.3d 687 (6th Cir.2013)—cases decided after Miller's 2011 conduct—in pressing that J.B.'s rights actually were clearly established in this circuit at the time of the interviews. But both those cases concerned warrantless entry by social workers into the *home,* a feature that triggers all manner of heightened privacy concerns.

In *Andrews,* the plaintiff asserted that social workers—along with several police officers—entered and searched his home without his permission and coerced him into granting permission to interview his children outside his presence. 700 F.3d at 849–52. The court stressed that "the Fourth Amendment has drawn a firm line at the entrance to the house" in holding that the social workers' conduct violated the Fourth Amendment. *Id.* at 854–56 (quoting *Payton v. New York,* 445 U.S. 573, 590, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)). But because "it was not evident under clearly established law whether the [social workers] were even required to comply with the strictures of the Fourth Amendment" at the time of their 2008 conduct, the court granted them qualified immunity. *Id.* at 863.

A year later, this court denied qualified immunity to social workers who effectuated a warrantless *removal* of children from their homes, holding that—by 2002—clearly established Fourth Amendment law prohibited such action. *See Kovacic,* 724 F.3d at 698–99. The court distinguished *Andrews:*

[W]hile *Andrews* addressed the warrantless *entry* of social workers into homes, our case at bar involves the warrantless *removal* of children from their homes. . . . While there certainly remain unresolved issues relating to the Fourth Amendment, as noted by the dissent, the issue at hand—whether a government official can seize children from their homes without a warrant or exigent circumstances—is simply not one of them. *Id.* at 699 (footnote omitted).

Thus, *Andrews* and *Kovacic* instruct that, by 2008, social workers entering a home without a warrant violated no clearly established rights, but those removing a child from a home without a warrant did. Inasmuch as both decisions turned on the greater constitutional concerns surrounding government intrusion into a citizen's home, *see Andrews*, 700 F.3d at 854, 856, 859; *Kovacic*, 724 F.3d at 695, 698–99, they offer Barber little support in arguing that the *in-school* interviews violated J.B.'s clearly established Fourth Amendment rights. *See Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 508 (6th Cir.2012) (explaining that we must "carefully define the right").

And even if we were to accept Barber's view that the warrantless, in-home questioning in *Andrews* mirrors the interviews here, the *Andrews* court granted the social workers qualified immunity because circuit precedent in 2008 provided little instruction on the Fourth Amendment's application to social workers. 700 F.3d at 860–63. Barber points to no intervening Sixth Circuit or Supreme Court decision clarifying the confusion that reigned in 2008. *See Brent v. Wenk*, 555 Fed.Appx. 519, 527 (6th Cir.2014) (granting qualified immunity under *Andrews* because the plaintiff "cite[d] no case that would indicate a change in this circuit's law between 2008 and 2010, when the events of [that] case

took place."). As no clearly established law proscribed the 2008 conduct in *Andrews*, none prohibited Miller's 2011 conduct here.

Barber also relies on two out-of-circuit cases to support his contention that Miller's interviews violated J.B.'s clearly established rights. But because the Supreme Court vacated the Fourth Amendment holding in one of those cases on mootness grounds, *Greene v. Camreta*, 588 F.3d 1011 (9th Cir.2009), *vacated in part*, 563 U.S. 692, 131 S.Ct. 2020, 179 L.Ed.2d 1118 (2011), we need not concern ourselves with that case. In the other case, *Doe v. Heck*, the Seventh Circuit held that the defendant social workers violated a child's Fourth and Fourteenth Amendment rights by interviewing him on parochial school premises without his parents' or the school's consent. 327 F.3d 492, 499 (7th Cir.2003). Because the social workers pointed to no evidence giving rise to a reasonable suspicion that the plaintiff parents were abusing their child, the interview violated the child's constitutional rights. *Id.* at 515, 524.

■ *Doe* lends little support to Barber's position regarding the clearly established nature of J.B.'s Fourth Amendment rights because a single out-of-circuit case generally cannot clearly establish the law in the Sixth Circuit. *See Brent*, 555 Fed. Appx. at 530 (citing *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042–43 (6th Cir. 1992)).

For the decisions of other courts to provide such "clearly established law," these decisions must both point unmistakably to the unconstitutionality of the conduct complained of and be so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable [social worker] that his

conduct, if challenged on constitutional grounds, would be found wanting. *Russo,* 953 F.2d at 1043 (citing *Ohio Civil Serv. Emps. Ass'n v. Seiter,* 858 F.2d 1171, 1177 (6th Cir.1988)). *Doe* offers no such unmistakable foreshadowing.

In the end, Barber falls short of demonstrating that J.B.'s Fourth Amendment rights in the context of warrantless, in-school interviews by social workers on suspicion of child abuse were clearly established in our circuit at the time of the interviews. Given the lack of guidance in this area, we are hard pressed to say that a "reasonable social worker, facing the situation in the instant case, would have known that [his] conduct violated clearly established law." *Andrews,* 700 F.3d at 861. Accordingly, Miller enjoys qualified immunity from these Fourth Amendment claims.

### *Fourteenth Amendment Rights Not Clearly Established*

Barber also contends that these interviews violated his Fourteenth Amendment substantive due process rights. He describes these rights as the "fundamental liberty interest of natural parents in the care, custody, and management of their child," and argues that government intrusions on these rights must pass strict scrutiny. But in pressing the clearly established feature of these rights, he cites two cases that have little relevance to the factual situation here. In *Wisconsin v. Yoder,* the Supreme Court held that a state statute requiring parents to send their children to high school infringed on the religious liberties of Amish parents. 406 U.S. 205, 219, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). And in *Barrett v. Steubenville City Schools,* this court held that the Steubenville school board's policy of requiring teachers to enroll their children in Steubenville city schools violated the plaintiff teacher's clearly established constitutional right to direct the education of his child. 388 F.3d 967, 974 (6th Cir.2004). Neither case provides a backstop for Barber's argument that Miller's in-school interviews of J.B. violated Barber's clearly established parental due process rights.

▮ In fact, our circuit has explained that "[m]ere investigation by authorities into child abuse allegations without more … does not infringe upon a parent's right to custody or control of a child." *Kottmyer v. Maas,* 436 F.3d 684, 691 (6th Cir.2006). Indeed, "the right to family integrity clearly does not include a constitutional right to be free from child abuse investigations." *Id.* (quoting *Watterson v. Page,* 987 F.2d 1, 8 (1st Cir. 1993)). And though Barber again analogizes to the Seventh Circuit's decision in *Doe* in arguing for the clearly established element of his parental rights, *Doe*—as previously explained—offers minimal support for that proposition. *See Brent,* 555 Fed.Appx. at 530. Barber therefore fails to carry his burden of showing that Miller's interviews of J.B. violated Barber's clearly established substantive due process rights.

### B. The School Pick Up

Barber also claims that Miller violated his and J.B.'s clearly established Fourth and Fourteenth Amendment rights by removing J.B. from school pursuant to the protective-custody order.

### *Fourth Amendment Rights Not Clearly Established*

Barber points to no Supreme Court or Sixth Circuit case law clearly establishing J.B.'s right to avoid removal from school under the circumstances here. And his reliance on *Kovacic* again proves unhelpful. The social workers there effectuated a *warrantless* removal of the children *from*

*their home.* 724 F.3d at 692. Although they acted pursuant to a "Juvenile Court standing order" generally allowing social workers to remove children from their homes in case of emergency, the social workers sought no judicial pre-approval for the removal. *Id.* Indeed, those social workers waited until the next day to submit a child-abuse complaint to the juvenile court. *Id.*

In contrast, Miller obtained a court order *before* removing J.B. *from school.* Barber's general assertions that "the Fourth Amendment was violated as to J.B. when he was seized pursuant to the order" that he claims "was based on false statements and otherwise lacked probable cause" invoke no clearly established right.

### No Fourteenth Amendment Deprivation by Miller

■■■ Barber also argues that Miller violated Barber's clearly established substantive due process rights by removing J.B. from school pursuant to the court order. In this circuit, "[a] parent is necessarily deprived of his or her right to custody and control of their child, either permanently or temporarily, when a child is removed from the home." *Kottmyer,* 436 F.3d at 691. But Barber may fault only the family court—and not Miller—for any due process deprivation here. *See Pittman,* 640 F.3d at 729 (dismissing the parent's substantive due process claim against the social worker because "to the extent that [the parent] suffered a deprivation of his fundamental right to family integrity, that deprivation was perpetrated by the juvenile court, not by [the social worker]"). "Because the juvenile court has the ultimate decisionmaking power with respect to placement and custody, it alone could deprive [the parent] of his fundamental right." *Id.; see also Kolley v. Adult Protective Servs.,* 725 F.3d 581,

586 (6th Cir.2013) (rejecting the plaintiff's substantive due process claim because "[d]espite the alleged misrepresentations, the [Michigan] court was the final decision-maker regarding [the disabled adult's] custody decisions").

As in *Pittman* and *Kolley,* the family court here possessed the final authority to issue the protective-custody order. *See Godboldo v. Cnty. of Wayne,* No. 14–11065, 2015 WL 5771921, at *10 (E.D.Mich. Oct. 2, 2015), *appeal docketed,* No. 15–2438 (6th Cir. Nov. 23, 2015) (holding that "[t]he court has the final authority to issue an ex parte order for immediate protective custody [under] Michigan Compiled Laws § 712A.14b"). Consequently, only the family court could deprive Barber of his right to J.B's custody and control. Barber therefore fails to state a claim against Miller for violating his substantive due process rights when Miller removed J.B. from school.

### V. Declaratory Judgment

■■■ Finally, Barber seeks a declaratory judgment striking down Mich. Comp. Laws § 722.628(8) and (9) as unconstitutional under the Fourth and Fourteenth Amendments. This statute requires schools to cooperate with CPS's child-abuse investigations by "allowing access to the child without parental consent if access is determined by the department [of human services] to be necessary to complete the investigation or to prevent abuse or neglect of the child." Mich. Comp. Laws § 722.628(8). The district court held that Barber lacked standing to challenge the statute because he "provided no evidence that he has been threatened with further or repeated removals of J.B. or future proceedings in family court." We agree.

■■■ To support Article III standing, Barber must show—among other things—that it is "likely, as opposed to

merely speculative, that the injury [he suffered] will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (quoting *Simon v. E. Ky. Welfare Rights Org.,* 426 U.S. 26, 41–42, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)) (internal quotation marks omitted). Though Barber has standing to sue under § 1983 for *past harms,* he must demonstrate separate standing to seek declaratory or injunctive relief focused on prospective harm. *See O'Shea v. Littleton,* 414 U.S. 488, 495–96, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects."). In doing so, he must show that the "threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus,* —— U.S. ——, 134 S.Ct. 2334, 2341, 189 L.Ed.2d 246 (2014) (quoting *Clapper v. Amnesty Int'l USA,* —— U.S. ——, 133 S.Ct. 1138, 1150 n. 5, 185 L.Ed.2d 264 (2013)).

In arguing for standing, Barber insists that state law requires him to send J.B. to school, and social workers will therefore have future access to J.B. under § 722.628. Barber further points out that, about eleven days after CPS returned J.B. to his custody, a social worker followed up with Barber, which suggests CPS's "ongoing interest into [Barber's] familial affairs." Finally, he contends that future injury is likely because CPS routinely fails to follow mandatory procedures under state law, such as video or audio recording the interviews of children.

These allegations—taken as true—evidence no "certainly impending" injury. Barber suffers no immediate threat of harm from the challenged statute greater than that of any other parent in Michigan. *See Johnson v. Turner,* 125 F.3d 324, 336–39 (6th Cir.1997) (holding that plaintiffs lacked standing to seek a declaratory judgment that Tennessee paternity and child support statutes were unconstitutional because, at the time of the complaint, the state court contempt and paternity proceedings were final, and the plaintiffs could not show that they were threatened with further or repeated proceedings). Barber admits that the state child-custody proceedings are closed. To demonstrate that he will again be subject to the Michigan statute, Barber would have to show the likelihood of a future report that J.B. is being abused or neglected. Mich. Comp. Laws § 722.628(8). He must also show that CPS, in assessing that report, will determine that an interview without parental consent is "necessary to complete the investigation or to prevent abuse or neglect of [J.B.]." *Id.* Barber's allegations fail to establish that this scenario certainly impends. He thus lacks standing to pursue declaratory relief in relation to § 722.628.

## VI. Conclusion

Discerning no error in the district court's dismissal, we AFFIRM.